Last case this morning is Chandan Steel v. United States, 2025-1291. Mr. Dutra. Good morning. May it please the Court, Jeremy Dutra on behalf of Chandan Steel. Commerce never determined, in this case, whether there was an actual record gap relating to sales under its own methodology, and that's a threshold error that we view as dispositive in this case. Their own decision memo concedes that they only thought that a window sale may be the best, possibly could be the best. That's speculation. On the unrebutted record, the universe where a gap even theoretically could have existed for comparison sale was at most 0.4 percent, a very negligible amount. Yet, Commerce disregarded everything. That's not filling a gap under Zhejiang. That's throwing the baby out of the bathwater. So again, turning to the first point, Your Honors, they never identified an actual gap, and that's what 1677E says. Commerce has allowed these facts otherwise available to fill a gap in the record, and that's Zhejiang case at 1348. Well, wait a minute. Maybe a misunderstanding. It's late in the day.  But because your last submission was untimely, they didn't accept it, so it was not in the record. So there is a gap in the record, right? Or am I misremembering what went on here? It was probably a little bit of a confusing record, COVID at the time. But that is correct, right? Didn't they reject your final submission because it was out of time, and therefore the result, assuming they were right in whatever they did, was there is a gap in the record. They rejected a revised sales database that included the window period sales for the small diameter through the website. There was a gap in the record. I know your position is it was a small gap, but there was a gap in the record. Your Honor, I push back on that. The POR sales, it was from May until September for the U.S. sales. And so any window period sale for comparison, that first sale would have gone back to April, back to March, and maybe back to February. That's maybe what was missing. You had March through September of all the comparison market sales. So it's very possible that there wasn't actually no gap whatsoever. And on the tail end, you have the last sale in September. So at most, you would go to October, November if there was an identical sale in the month of September or the three months prior. And so I would submit, Your Honor, from June 2018 to July 2019, the Commerce's window methodology sale, all the data was there. You're only talking about the tension. The trade court, they said you had three chances to submit the data in the way that it had been requested, getting the information for the period of review and the window periods. And none of the three submissions actually provided the complete data that Commerce asked for. Is that right? Well, I'd push a little back on the framing, Your Honor. Yes, the initial questionnaire asked for the sales data. I know you want to make the secondary argument that, well, the data that was submitted, once you add it all up, it really does cover just about everything to such a point that there's only a de minimis amount missing. But just to get the baseline understanding correct, none of the three submissions complied with the order to submit, like, a complete comparison market sales database that would include the window period. I think that's fair. You are correct. In terms of one complete database with full window period sales for the full diameters of, you know, what the products were issued. And that's the form and manner of the data that Commerce has a right to ask for, right? That's correct. And I think what Commerce goes back to is, well, we asked for it three times. And that's not exactly precise. They did ask for it in the initial questionnaire. Chandon misinterpreted. They understood one half to be 1.5 inches to 24 inches, and that's what they provided. Commerce came back in the supplemental question and said, hey, your last sale is in September. Please provide the last two months of October and November. Chandon provided that. And then in a second supplemental questionnaire, Commerce realized, wait, hold on, we're seeing that Chandon is misunderstanding the questionnaire in terms of the scope, because it interpreted one half to be 1.5 to 24, and it asked to update all the databases, so cost of production as well as U.S. sales, covering the 0.5 and the specified 0.5. They recognized there was a misunderstanding there. Chandon did provide, updated it. It interpreted it as the period of review. It made a mistake. So you're correct, Your Honor, that ultimately there was not a single database that was produced, but it's unfair to say that Commerce asked that same question multiple times, and it didn't respond. Chandon was responding and trying to address the deficiencies or the questions that Commerce had. Ultimately, there was a mistake, and we submit that under 1677M, in that situation, it would have been obligation of Commerce to say, wait, where are the window period sales for this revised sales database? The problem you have, however, so if you can respond to why you don't think it's a problem, is that we're not here on de novo review. We're not here deciding whether we would have done the same thing, whether we agree that this was the best cooperation and the best availability. Every provision of the statute that's cited here is highly deferential to Commerce, and I think that's the essence of what the reviewing judge Stancu said here in his review as well. So how do you get around that? I mean, I know you have a number of issues, not just this, but there should have been a partial AFA, and the amount was too draconian to fit the thing. Where's the basis for our reviewing that on anything other than a highly deferential standard? Well, Your Honor, I think while there is deference, the agency can't just ignore the record either, and it's unrebutted, and I know to your point, Judge Chen, about the 0.4 percent of sales. That's a very small amount of sales. Again, if you want to apply a partial AFA there, perhaps, but the cases that they cite, you're talking about Zhejiang, you're talking about Diamond Saw Blades, where the bulk of the data is flawed, unreliable. Here you're talking about a very narrow sliver, a negligible amount, where there's potentially an issue here, and I realize that there were multiple databases, but Commerce's own practice in court service products, they had three different databases. They combined those, and they actually made some adjustments as well. So Commerce is able to do that, and they have done it in past cases as well, and given how negligible… Were they required to do that here? They were required to unilaterally on their own say, okay, we're just going to go through all of the three submitted databases, and we're going to pick them all apart and create a composite that is the best representation of Chen's database. I'll be careful here, Your Honor. I'm not going to say that the statute requires them to specifically have done that, but they have done this type of thing in the past, and again, where it was a narrow issue to disregard all of the data. And again, it's all based on speculation. Yes, I understand that certain window period sales weren't there, but they never even tried to see if that actually results in a gap. The window only matters because they want to be able to compare a U.S. sale to a comparative, identical, or similar product. They don't know if that actually required them to go to a missing window sales, and for the vast majority, nearly all of the U.S. sales, that data was already there in the comparison market. You're really dealing with a very small amount where the window would have even been relevant from the first sale to the last sale. And so in that situation, Your Honor, that's not a total AFA where you disregard absolutely everything. That's a situation where, at most, you do a partial AFA as to those sales where you couldn't find the comparison sale because the window wasn't there. Commerce didn't even go through its methodology, even find if an actual gap existed in the record. They just assumed that maybe there's one because maybe there's something there, possibly. That's speculation, and that's not substantial evidence, Your Honor. Can I, just a process question? Of course. My recollection of the record is there were three bases, independent bases, upon which the Commerce Department relied on to reach this number. The judge, the CIT judge, says, I only have a need to do one. Even assuming hypothetically we were to agree with some or all of what you're saying here today, the necessary result would be a remand, right? That's correct, Your Honor. For the CIT judge to consider the alternative bases, right?  Thank you. Yes, Your Honor. Can you remind us what did the trade court say about the potentiality of doing a partial AFA? The trade court didn't really wrestle with it. It sort of accepted what Commerce said, that this is flawed. We want to have the best data here. It's incomplete in the record. Therefore, because sales databases and the comparison is so critical, the total AFA was appropriate here. I can't remember everything in this statute, but there is something in the statute that I think is a requirement that you have to act to the best of your ability. And then if you don't act to the best of your ability, then the consequences can be quite severe. Isn't that kind of black and white? The statute talks about there being a gap in the record so that you have facts otherwise available and that there could be an adverse inference if a party doesn't act to the best of its ability. Here, Your Honor, in terms of the AFA, this court's precedence, as I mentioned in Zhejiang at 1348, as well as Diamond Sawblades, we're dealing with a total AFA situation. There's non-responsiveness, fraud. I'm not saying that there is an intent element there, but we're talking about the severity, right? In terms of what Commerce uses its powers to do needs to address the severity. And that goes back to BMW and Nifcon as well, Your Honor, where it's the totality of the circumstances, right? Before you have the sort of death penalty of the AFA and that total AFA, you have to consider the record here. And I think the record here is presented to Commerce. You had a party that had not been involved in a review for a number of years. It was a smaller company. You had COVID. And I realize that, you know, that is probably an overused excuse, but it was documented in the record. You had hospitalizations. You had severe lockdowns for India. So, again, you had a situation where a global pandemic was impacting this, and Commerce itself was extending its own deadlines. And you didn't have a situation where Chandler was just standing on his answers and the same questions would be over and over again. Chandler was engaging with Commerce. They were providing information that it thought was responsive. And then, as is typical, Commerce came back with supplemental. They drilled down. They sought clarifications. And Chandler provided that information and those responses. And I think all of that necessarily has to go into whether a total AFA is appropriate here versus a more targeted AFA for those issues where Commerce actually determined there was an actual gap when it actually ran its own methodology. So we would submit, Your Honor, that under BMW and Nippon, that they failed to address all the information, not only what they thought supported AFA, but also the evidence that detracted from an AFA finding. That's what substantial evidence requires. And I'll just briefly touch, Your Honor, on the rate, the 145.25%. Again, in the investigation, Commerce found that there was a 19.16%. This is over seven and a half times that investigative amount. And again, under Diamond Saw Blades, the rate has to be reasonably accurate. Estimate of the respondent's actual rate. Obviate with a built-in increase for deterrence. It's deterrence, not punishment. And we would submit that a rate that was over seven and a half times the found rate in the immediate segment for Chandon, that's punishment. That's not deterrent. It's aberrational as well. And that's also with Gallant Ocean, that the idea is to incentivize and cooperate, not to impose a punitive and aberrational. Now, I know that – Do you want to save the rest of your time or use it? Your Honor, I will save the remainder of my time. Thank you. Mr. Long. Good morning, and may it please the Court. The CIT's judgment should be affirmed here, not only because of the fact that Chandon's cost comparison or comparison market database was unusable after three attempts, but going to Your Honor's question, Judge Prost, about whether or not the Court can consider the other issues that weren't reached by the CIT. The Thompson Multimedia case, which we cite at page 30 of the red brief, points out that where the argument was made below and is supported by the record, this Court can affirm on that basis. And so even if you were to believe that the trial court or CIT should have touched on these issues, you can reach them here. Wait, are you saying that we should reach on our own, not – let's assume we reject the analysis on this one category. You're saying that we should independently review the other categories that the CIT didn't opine on? That's what the Thompson Multimedia case states, Your Honor. And there's no reason why not. It's a record review, and so there's no reason why you have the same information for you. But if you agree, we would have discretion in that regard. So we could do it, but we could send it back to the CIT. Yes, Your Honor, if I was unclear about that. Okay, let me ask you this question, not the other things, this question. What if – Commerce has the discretion to say, okay, it was a late filing, but it's okay. I mean, this is during COVID, and your friend hasn't presented this evidence, so this is a hypothetical. But what if he had sent a letter and said, look, everybody in my office has gotten COVID. The person that was in charge of the first two times hasn't been in in four months, and now there's a new person. And that's why we had the mess up with somebody doing the window period and then for the other stuff not doing the window period. Please forgive us. This was inadvertent. So Commerce had the authority to say, got it, okay, moving on.  Yes, Your Honor. Okay. And, in fact, one of the reasons why Commerce resorted to total adverse inference here is that Chandin failed to submit useful information despite receiving multiple extensions. And so that's pointed out. That's addressed by Commerce in its decision making. It considered these extensions that were granted. And, yes, Commerce can grant extensions in certain circumstances. It did so. I don't – unfortunately, I have a list of exactly all the extensions that were granted, but it was pointed out in the, I think, preliminary decision here that it did do so. And so coming to the comparison market database, there's been a lot of discussion about, well, I think ultimately we've reached the point where we understand that no one of the three submissions was adequate. The question is, well, if you compile them all together, what does that make? So two answers. The first is that the second submission had other deficiencies that Commerce pointed out and asked Chandin to correct. So the fact that the window period sales are contained in that and sales below a certain diameter or not is not itself sufficient. Now, I believe Chandin's position as well. These were correctable issues, but that doesn't make for – at some point you've reached a point where the agency is being asked to correct, compile, put together all things that were clearly required of the respondent. But does it matter how small a piece of the pie this was, the 0.38% or whatever number Judge Chen had at his fingertips? Doesn't that matter? I mean, under the – we've got a case, Moocant, one of our opinions, and it sort of says the difference between partial facts available and adverse is if it's something that's core and not tangential to Commerce's analysis. Go ahead. I apologize. So Commerce's conclusion here is that it rendered it impossible to determine, and I think I have not seen a firm number. I think what Chandin says is it's at most 0.6% or there's no way to know exactly how the match would have worked without the full scale of information because the matching has to be done with a full database. And so we don't know exactly. I point, Your Honor, to, well, first of all, the fact that this was asked for repeatedly and was still wrong, and also, this goes back to my earlier point, the fact that there were other deficiencies in Chandin's responses. The trade court didn't focus on those other deficiencies. But Commerce did, Your Honor. I know, but we're just – for purposes of understanding the trade court's analysis. It seems to me that the trade court didn't wrestle with the question of, is this really an unusable database? I've heard you say, well, none of them were usable. None of them were adequate. But it's not clear to me that we know that. The trade court, I don't think, necessarily commented on that. And I guess the point the other side is making is, before we take the ultimate draconian step of doing a full AFA, shouldn't Commerce try to make some effort to figure out whether the submission itself as a qualitative matter is potentially good enough? I know you want to say there were other reasons that the data was problematic. But just for purposes of this one question, if, in fact, Chandin is saying, you have 99.6% of the data that you need, it's not perhaps all pretty and presented with a bow on it, but we've given it to you. So doesn't it stand to reason that before Commerce completely throws it all out the window and says, well, 99.6% isn't good enough. We're just going to do total AFA on you. Goodbye. Shouldn't there be some reasonable, I don't know, review of the submission? As opposed to saying, you haven't dotted every I. I've got all these rules. You've got to dot all your I's. You've got to cross all your T's. The commas have to be in the right place. And if they're not, and if there's a couple things missing, you're out. So, Your Honor, I think the answer to that, and I apologize, I'm trying to find the statute to read to you while I'm here, but gap filling is permitted under the Tariff Act where the respondent has acted to the best of its ability. Here, there was a finding that Chandin didn't act to the best of its ability. And that analysis is that question of how you fill gaps is a little bit different from the subsequent question of whether you're going to use an adverse interest where gaps are missing. So it's sort of a two-step question. Are there gaps? Can they be filled? And then, if the gaps remain, should you apply an adverse inference? Somewhere in there, did they use the best of their ability? So the adverse inference question looks at whether they were non-cooperative, essentially, in assisting. And the question of gap filling looks to whether or not they acted to their best ability. Commerce found that they didn't. I agree with your read of the CIT's decision that that was the focus of Judge Dansu's analysis on the comparison market question was, well, they didn't do their best, gaps remained, that's enough to say that commerce is not required to fill in those gaps. And then you reach the adverse inference question, which then, in going to what we call a total adverse inference, at that point, commerce is looking at not just the comparison market database, but also the cost database and the product drawings that we haven't talked about much and other reporting deficiencies that, in commerce's view, added up to justification for use of the total adverse inference as a means to deter Chandin from securing a better rate than it would have secured. But if we just wanted to look at the trade court's analysis, is the trade court's analysis good enough? When it didn't look at all these other databases, it just looked at the comparison market database question. There would still be a gap, even if we were to do this combination. There's still a gap. There's still not a way to know exactly how things would come out in the absence of that gap. And so I think the trade court is correct in its analysis. The other side is saying, no, you don't just reach a conclusion that there's a gap in the information and then commerce is entitled to use total AFA. Instead, there's a broader evaluation of the totality of the circumstances before you do that. Can you respond to that? Yes. I think that goes to my earlier response, Your Honor, which is that in deciding whether to use an adverse inference when choosing from among facts available and going to total adverse inference, commerce is considering the totality of the circumstances. And we see that in commerce's decision-making, that they did consider the totality of the circumstances. As I mentioned earlier, they looked at the fact that Chandon had received extensions. It's also pertinent that they were the largest producer of the subject merchandise and that they were participants in the less-than-fair-value investigation, so they had experience with this. So commerce did consider the totality of the circumstances and concluded with reference to that totality that this total adverse inference was appropriate. I can't recall that Judge Stansu did that, too. I think Judge Stansu's analysis is consistent with what we've been talking about, Your Honor, which is that he viewed the problems with the comparison market database in itself to be justification for resort to complete adverse inference and use of the 145% rate, which I'll just touch on here. So this court has held, I think in paper fabric, that using transaction-specific margins is appropriate when developing an adverse margin where those transaction-specific margins are attributable to the respondent. That's what happened here. 145% was the amount assigned to an entity called Babitz in the less-than-fair-value investigation. That rate against Babitz or applied to Babitz was based on Chandon's own transaction-specific margins in the investigation. So yes, Chandon received an overall margin in the investigation of, I think, about 19%, but it had individual transactions that were higher, 145%, and those transactions were what Commerce based its rate on in this review. And that has been approved by this court in prior cases, and it was appropriate here. Did you need that kind of corroboration? So I think the court's decisions, whether that's the only way to reach 145% here, whether that would be the only way, I'm not sure, but it's that approach, that transaction-specific approach, has been endorsed by the court in prior decisions. If there are no further questions, we ask that the court affirm. Thank you, Mr. Long. Mr. Deutschner has some rebuttals on. Thank you, Your Honor. I'm going to pick up on the 145. They do cite the Papper Fabrique case. That involves a case where the respondent was actually found to engage in outright intentional fraud, so they couldn't believe anything that was being said. It also referenced the Todd Chen case, but in that case, Todd Chen had admitted and conceded that it was representative. And there was other cases, PAM, where Congress had actually made the determination that in totality of the circumstances, that sort of single transaction corroboration was an aberration, was not unusual because of looking at the quantity, price, and other circumstances of the sale. That's all absent here, Your Honor. And it's not clear, again, it was the petition rate of 145.25, which, yes, it's unclear whether it was multiple or a single sale that happened to be at 145 rate. But, again, they just wrongly picked, yes, they had the ability to go to the highest rate, and they just did without any examination of whether that was appropriate given the circumstances here and given what the issue was in terms of the database itself. Just, again, and I concede to Your Honor's question, window sales did not exist for February, October, and November for small diameter sales. For the remainder of it, Commerce itself conceded, and as my friend on the other side has said, that they can make the fixes. And one of those fixes really, the real issue there was on the gross unit price before deductions. All the data was there. And Chandon provided it in CR1, which is at APTX 3365-66 and 3363-64, showing how this could be corrected, and Commerce itself conceded that it was an easy fix. So, Your Honor, based on all of that, we do request that you reverse the CIT decision and remand it. Thank you. Thank you for those arguments. The case is submitted.